UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Christopher Michael DeLuca,                Civil No. 10-2032 (JNE/FLN)

        Plaintiff,

    v.                                                  **REPORT AND RECOMMENDATION**

Michael J. Astrue,
Commissioner of Social Security,

        Defendant.

_____

Stephen J. Beseres for Plaintiff.
Lonnie F. Bryan, Assistant United States Attorney, for Defendant.
_____

Plaintiff Christopher DeLuca seeks a judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), who denied his application for disability insurance benefits. The matter has been referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636 and Local Rule 72.1. This Court has jurisdiction over the claim pursuant to 42 U.S.C. § 405(g). The parties have submitted cross-motions for summary judgment. (ECF Nos. 6 and 15.) For the reasons set forth below, the Court recommends that the Commissioner's decision be **AFFIRMED** and this case be **DISMISSED with prejudice**.

## I.    INTRODUCTION

Plaintiff Christopher DeLuca applied for disability insurance benefits ("DIB") on January 4, 2007. (ECF No. 4, Administrative Record [hereinafter "R."] 106-08.) Initially, Mr. DeLuca claimed his disability began on January 31, 2001, but amended this disability onset date to July 1, 2005 at the administrative hearing, citing the onset of psychological symptoms including

difficulties with memory and concentration. (*See* R. 11, 24–25.)  Mr. DeLuca underwent surgery to repair a brain aneurysm in 1997 and has suffered from encephalopathy, major depression, organic brain syndrome,[1] and bilateral shoulder impingement syndrome. (R. 13.) The Social Security Administration ("SSA") denied Mr. DeLuca's application for DIB on March 15, 2007 and, upon reconsideration, on May 30, 2007. (R. 11, 64–66, 75–76.)  Mr. DeLuca filed a written request for a hearing on June 8, 2007, which was held on March 16, 2009 before Administrative Law Judge ("ALJ") Roger W. Thomas. (R. 11.)  The ALJ ultimately determined that Mr. DeLuca retained the residual functional capacity ("RFC") to perform light work, and denied his application for DIB.  He based his conclusion on three factors: Mr. DeLuca's failure to follow through with the recommended treatment; the lack of significant abnormal findings on examination; and the inconsistencies in the record regarding Mr. DeLuca's daily activities. (R. 18.)  Mr. DeLuca appealed the ALJ's decision on June 29, 2009; the Appeals Council denied his appeal on March 24, 2010. (R. 1-6.)  On April 30, 2010, Mr. DeLuca commenced this civil action for review. (ECF No. 1.)  Both parties then filed cross-motions for summary judgment. (ECF Nos. 6 and 15.)

## II.    STATEMENT OF FACTS

### A.  Background

Mr. DeLuca was born on September 1, 1959. (R. 18.)  His insurance lapsed on March 31, 2007, at the age of 47. *Id.*  Mr. DeLuca obtained a GED, joined the Minnesota National Guard and received electronics training at the U.S. Army Signal School. (R. 150.)  Mr. DeLuca's

---

[1] Organic brain syndrome, or "organic mental syndrome," is a general term used to refer to "a constellation of psychological or behavior signs and symptoms without reference to [the cause]." American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders*, 97, 100, 563 (3rd ed. 1987).  The American Psychiatric Association removed organic brain syndrome from the fourth edition of the Diagnostic and Statistical Manual of Mental Disorders.  *See* American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders*, 875-86 (4th ed. 1994).  Under Subpart P, Appendix 1 of 20 C.F.R. § 404, an "organic mental disorder" is defined as "psychological or behavioral abnormalities associated with a dysfunction of the brain." 20 C.F.R. § 404, Subpt. P, App. 1.

impairments include encephalopathy, major depression, organic brain syndrome and bilateral shoulder impingement syndrome. (R. 13.)   Mr. DeLuca claims these impairments (with the exception of bilateral shoulder impingement syndrome[2]) arose from a surgery performed in 1997 to repair an anterior cerebral aneurysm. *Id.*  Mr. DeLuca first sought treatment for problems with memory, coordination and vertigo in November of 2006. *See id.*

Mr. DeLuca worked at Honeywell from 1985 until January 2001. (R. 27, 142.) Honeywell promoted Mr. DeLuca, who began his employment as an Installer, to the position of Installation Manager, a position in which he supervised approximately 20 employees.  (R. 28-29.)  When he returned to work after his surgery, Mr. DeLuca worked only "about half-time." (R. 237.) Mr. DeLuca received a severance package from Honeywell when he left in January of 2001; he did not engage in full-time employment thereafter.[3] (*See* R. 27.)

**B.  Medical Evidence**

**1.  Dr. Steven Voss – Primary Care Physician**

Mr. DeLuca visited Steven Voss, M.D., his primary care physician at Allina Medical Clinic, in November of 2006, at which time he complained of difficulties with memory, episodes of vertigo and problems with his coordination.  (R. 225.)   Mr. DeLuca also complained of issues with fine motor control and insomnia.[4] *Id.*  Mr. DeLuca's wife, Connie DeLuca, told Dr. Voss that she had not noticed any "fall off" in Mr. DeLuca's memory or behavior over the last two years.  (R. 227.)  Dr. Voss ordered a head CT scan, which showed evidence of Mr. DeLuca's

---

[2] Mr. DeLuca complained of shoulder pains to his primary care physician, Dr. Voss, as early as August 13, 2003 after installing an above ground pool in his backyard.  (R. 228.)

[3] Mr. DeLuca claims to have left Honeywell because he was not physically or mentally "strong enough" to work full-time. (R. 30.)  Mr. DeLuca reported that he was only able to continue working after his surgery because his supervisor was lenient and a friend of his. (*See* R. 237.)  Mr. DeLuca later explained to Dr. Hoj that he was ultimately "let go" from Honeywell in 2001 due to his poor performance. (*See* R. 329.)

[4] Mr. DeLuca further described his hobbies to Dr. Voss as raising chickens, watching TV and surfing the internet. (R. 225.)   Mr. DeLuca also explained that he works "from time to time" with his son, who owns a pizza business, by helping "[him] get things fixed."  *Id.*

brain aneurysm surgery, but found nothing abnormal.  (R. 13, 234.)  Mr. DeLuca previously had

visited Dr. Voss twice between 2003 and 2006 without expressing any problems with memory,

vertigo or coordination.  (R. 228, 230.)

In March of 2007, Mr. DeLuca returned to Dr. Voss for a follow-up visit related to his

memory issues.  (R. 301.)   During his examination, Dr. Voss opined that Mr. DeLuca was

suffering from "anxious depression" and told Mr. DeLuca that depression could cause memory

impairment.  *Id.*  Dr. Voss recommended that Mr. DeLuca start a course of anti-depressants or

consider neurorehabilitation.   *Id.*   Mr. DeLuca was pessimistic about neurorehabilitation and

"adamant" about not taking any further depression medications.[5]  (R. 303.)  Dr. Voss convinced

Mr. DeLuca that he needed a psychological assessment in order to help him with his depression

and referred him to Dr. Penwarden at the Allina Medical Clinic. (R. 297.)

### 2.  Dr. Gail Risse – Clinical Neuropsychologist

Mr. DeLuca visited Gail Risse, Ph.D., L.P., on referral by Dr. Voss, in January of 2007.

(R. 238.)   Dr. Risse administered tests that assessed Mr. DeLuca's intellectual functioning,

memory processing, higher order problem solving, attention and concentration.  *Id.*   Mr. DeLuca

performed in the average range for intellectual functioning, the mildly impaired range with

respect to attention and concentration, and the above average range in higher order problem

solving. (R. 240.)   Dr. Risse noted that Mr. DeLuca's performance on the memory tests was

quite variable, which Dr. Risse partially attributed to "mild inattention," although she did not

rule out "the possibility of some reduced effort."  *Id.*   Dr. Risse found that Mr. DeLuca's

performance on the memory tests fell "significantly below" his IQ results, but noted that the

"marked variability across memory measures" raises "some doubts about the validity of these

---

[5] Mr. DeLuca had taken two anti-depressants shortly after his surgery in 1997, which, according to Mr. DeLuca, "made [him] just sick all the time" and caused "some significant weight loss." (R. 44, 327.)

scores." (R. 241.)  According to Dr. Risse, Mr. DeLuca's overall performance on these tests puts him in the "average range, roughly equivalent to his background and years of education."  *Id*. Dr. Risse opined, however, that that there were some indications that Mr. DeLuca's "overall test performance may represent relatively recent cognitive change." *Id*.  Dr. Risse noted that Mr. DeLuca placed his cognitive abilities in the "very superior range prior to surgery," as he believes himself to have had an IQ of approximately 132[6] before his aneurysm surgery. (*See* R. 241, 303.)

Dr. Risse also noticed that Mr. DeLuca was extremely upset about his scores, despite her attempts to reassure him "concerning his overall ability level." (R. 241.) This demeanor, combined with Mr. DeLuca's apparent depressed mood at the time of the appointment, caused Dr. Risse to recommend a clinical psychological evaluation. *Id*.  Dr. Risse opined that, despite Mr. DeLuca's inconsistent test performance and the lack of an apparent cause for this inconsistent performance, Mr. DeLuca was "functioning at a significantly higher level than he perceive[d]." (R. 242.)  Dr. Risse concluded that Mr. DeLuca's lower and inconsistent scores on memory tests could be "secondary to mild residual frontal lobe compromise, longstanding attentional deficits and/or decreased effort." *Id*.

### 3.  Dr. Robert Doss – Neuropsychology/Clinical Psychology

Dr. Risse referred Mr. DeLuca to Robert Doss, Psy.D., L.P., ABPP-CN,  for a Personality Assessment Inventory ("PAI"), believing that it would aid in "understanding the patient's current psychological status and to help clarify psychogenic factors to his cognitive presentation."  (R. 244.)  The PAI profile indicated that Mr. DeLuca was the type of individual that "may believe that [his] health problems are complex and difficult to treat [and whose] self-image may be largely influenced by the belief that [he is] handicapped by poor health." *Id.* Dr. Doss opined that

---

[6] Mr. DeLuca never produced evidence of his earlier IQ test results. (R. 304.) At the administrative hearing, Mr. DeLuca's attorney acknowledged the lack of supporting evidence, stating: "We've made some requests and they don't have the record." (R. 46.)

Mr. DeLuca's profile "indicates somatoform symptoms and cognitive complaints" and "suggests a possible psychogenic basis for his cognitive complaints." *Id.*

### 4.  Dr. Daniel Larson – SSA Medical Expert

In March of 2007, Daniel Larson, M.D., Social Security Administration Medical Consultant, completed a Psychiatric Review Technique Form for Mr. DeLuca and conducted an RFC assessment based on Mr. DeLuca's medical records at that point in time.[7] (R. 262-275.)  Dr. Larson found that Mr. DeLuca had no "markedly limited" functions, and that he could "concentrate on, understand, and remember routine, repetitive 3-4 step and limited, detailed instructions," but that he "would be markedly limited for multi-detailed or complex/technical instructions." (R. 278.)  Dr. Larson opined that Mr. DeLuca could maintain "superficial contact" with the public or co-workers and that, in order for Mr. DeLuca to "cope" with employment, he would need a supervisor who was "reasonably supportive." *Id.*

### 5.  Dr. Jeffry Penwarden – Psychologist

Jeffry Penwarden, Ph.D., L.P., saw Mr. DeLuca on referral from his Primary Care Physician, Dr. Voss, on April 29 and March 9, 2007. (R. 295-300.)  Dr. Penwarden opined that Mr. DeLuca was suffering from a single episode of major depression and that he was confused about his medical record, unemployment and his difficulty obtaining DIB. (R. 299.)   Dr. Penwarden also determined that Mr. DeLuca had a Global Assessment of Functioning ("GAF") of 45.[8] *Id.*

### 6.  Dr. Kenneth Hoj - Neurologist

---

[7] Due to the timing of this evaluation, the medical record would not have included the reports by Dr. Hoj and Dr. Montgomery.

[8] The GAF is a scale that "consider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," although it does not "include impairment in functioning due to physical (or environmental) limitations." American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders,* 32 (4th ed. 1994). A GAF in the range of 41-50 indicates "[s]erious symptoms or any serious impairment in social, occupational, or school functioning." *Id.*

Kenneth Hoj, M.D., saw Mr. DeLuca on four separate occasions between March 29, 2007 and January 18, 2008.  During testing at the first session, Dr. Hoj noted that Mr. DeLuca "had difficulty with the exact number date.  He could not remember 3 of 3 objects given to him and could only get 2 out of 5 in spelling WORLD backwards." (R. 332.)  During the third session, Dr. Hoj prescribed notriptiyline to help combat Mr. DeLuca's headaches.  (R. 327-328.)  Mr. DeLuca was very reluctant to take the medication as "he has had some bad experiences with medications in the past right after the time of [the brain aneurysm surgery] and felt that he was worse after it and had some significant weight loss with it."  (R. 327.)  By Mr. DeLuca's fourth and final visit, on January 18, 2008, a little more than a month after having been prescribed notriptiyline, he had ceased taking it as he "did not notice any improvement with the headaches and did not feel well on it . . . ."  (R. 324.)  Dr. Hoj opined, at this last session, that "it would be hard for [Mr. DeLuca] to maintain employment at this time given his level of functioning." (R. 325.)

On October 16, 2008, Dr. Hoj completed a Mental RFC Questionnaire for Mr. DeLuca. On the form, Dr. Hoj indicated that Mr. DeLuca was suffering from both a memory impairment and a disturbance in mood. (R. 347.)  Dr. Hoj further noted that Mr. DeLuca exhibited a "loss of interest in almost all activities," "sleep disturbance," "decreased energy" and "difficulty in concentrating or thinking." (R. 348.)  Dr. Hoj opined that Mr. DeLuca could tolerate either no or low stress in an employment setting, that Mr. DeLuca was suffering from symptoms that would prevent him from maintaining the "persistence and pace" necessary "to engage in competitive employment," and that returning to work would increase the severity of Mr. DeLuca's symptoms. (R. 350-51.)  Dr. Hoj also indicated that Mr. DeLuca's abilities to "understand and carry out complex job instructions," to "deal with coworkers, supervisors and the public," to

"tolerate normal routine supervision [and] accept instructions and criticism," to "deal with changes in a routine work setting," to "maintain attention and concentration for a two hour segment," and to "complete a normal workday or work week without interruptions from psychologically based symptoms" were poor.  (R. 352-53.)

### 7.  Dr. George Montgomery – Director, Brain Injury Clinic

On June 26, 2007, George Montgomery, Ph.D., L.P., A.B.P.P., saw Mr. DeLuca on referral from Dr. Hoj at the Brain Injury Clinic of Abbot Northwestern Hospital. (R. 336.)  Dr. Montgomery noted that, when discussing Mr. DeLuca's memory problems, "Mr. DeLuca and his wife will often disagree about something that has happened, but I am not convinced that he confabulates." (R. 337.)  Dr. Montgomery stated that Mr. DeLuca "is certainly not disabled on a purely neuropsychological basis," however, his "disability requires consideration of headache pain, psychological factors, and fatigue as more prominent contributors." (R. 338.)   Dr. Montgomery opined that "Mr. DeLuca  illustrat[es] a development of disability after a relatively mild injury to the brain," which Dr. Montgomery explained as follows:

> [E]arly in his course, it is likely that neuropsychological abilities were compromised and he was not able to conduct his affairs with normal efficiency and reliability . . . . During this time patients often apply compensatory effort to function normally.  This is usually ineffective, and leaves them fatigued and even more ineffectual in a vicious cycle. Their subjective sense of loss may evoke alarm and distress, with emotions then having additional deleterious effect on functioning.

*Id.*

Dr. Montgomery noted that this effect is more frequent in individuals whose "work responsibilities place high demands on problem-solving, memory and executive management skills, all highly vulnerable to brain injuries by trauma." *Id.* Dr. Montgomery recommended that Mr. DeLuca work with occupational therapists for "training in disciplines and prosthetics to back up and assist in memory and the management of activities" and that he meet with a psychologist

for "further assessment of potentially problematic emotional reactions and personality features." (R. 341.) Dr. Montgomery further stated: "If discernible progress can be made toward him re-establishing confidence and work skills, it will be important to involve a vocational counselor with the Minnesota State Rehabilitation Services to assist him in developing a reasonable occupational plan." *Id.* Dr. Montgomery added that a "barrier to significant progress with this man will be his long period of disability" and that Dr. Montgomery was "only guardedly optimistic" about Mr. DeLuca's prospects for positive change. *Id.* Dr. Montgomery diagnosed Mr. DeLuca with mild encephalopathy and possible organic brain syndrome and deferred a psychiatric diagnosis. *Id.*

On October 21, 2008, Dr. Montgomery also completed a Mental RFC Questionnaire for Mr. DeLuca. (R. 355.) On the form, Dr. Montgomery indicated that Mr. DeLuca had a GAF of 50. *Id.* Dr. Montgomery opined that Mr. DeLuca's symptoms would interfere with maintaining employment in a competitive environment and that Mr. DeLuca's symptoms would increase if he were to return to work. (R. 358-359.) Dr. Montgomery evaluated Mr. DeLuca as having a poor ability to: carry out detailed or complex job instructions; accept instructions and criticism; deal with changes in a routine work setting; concentrate; complete a normal work day or work week; and complete routines or work with others without being distracted. (R. 361.)

### 8.  Dr. Mark Miller – Licensed Psychologist

Mark Miller, Psy. D., L.P., saw Mr. DeLuca twice, on August 2 and 9, 2007, on referral from Dr. Montgomery, at the Brain Injury Clinic of Abbot Northwestern Hospital. (R. 367.) During both sessions, Dr. Miller noted that Mr. DeLuca was frustrated with his shortcomings and mildly depressed. *Id.* Mr. DeLuca voiced "complaints about his memory functioning," however,

Dr. Miller noted that Mr. DeLuca's "memory was within normal limits for both recent and remote events." *Id.*

Dr. Miller determined that Mr. DeLuca fell in the range of 55-58 on the GAF scale.[9] (R. 370.) He further opined that Mr. DeLuca appeared to "have the fund of knowledge and language abilities to be able to benefit from psychotherapy." (R. 367.) Although Dr. Miller noted some improvement at his second session, Mr. DeLuca chose to discontinue neuropsychology and occupational therapy at that time, as he felt "more frustrated than he was [before the treatment]." (R. 369.)

### 9.  Susan M. Newman – Occupational Therapist

Occupational Therapist Susan Newman met with Mr. DeLuca three times between August and September of 2007 on referral from Dr. Montgomery, at the Brain Injury Clinic of Abbot Northwestern Hospital. (R. 314.) Mr. DeLuca's goal, while under Ms. Newman's care, was to "improve memory and mental functions" by employing compensatory strategies and increased self-awareness. (R. 315.) Ms. Newman stated that Mr. DeLuca uses the treadmill every other day, but "takes it slow because he gets nauseated." *Id.* Further, Mr. DeLuca stated that he does not tend to "write anything down" but instead relies on his "'weak' memory." (R. 316.) Ms. Newman stated that Mr. DeLuca had completed his planned tasks of "carpet cleaning and cleaning his chicken coop." *Id.*

Mr. DeLuca ultimately terminated his therapy due to "the distance of his commute, the stress of driving in the city and not feeling like the service was impacting his level or effectiveness of functioning." (R. 314.) Ms. Newman noted that the goals of the therapy were

---

[9] A GAF range of 55-58 indicates "moderate symptoms or moderate difficulty in social, occupational, or school functioning." American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders,* 32 (4th ed. 1994).

"addressed but not met" and recommended that Mr. DeLuca "consider contacting the Minnesota Workforce to explore vocational options."[10] (R. 314, 316.)

### C. Function Report by Connie DeLuca

Connie DeLuca, Mr. DeLuca's wife, completed a third-party function report on January 26, 2007. (R. 152-67.)  Ms. DeLuca stated that Mr. DeLuca is able to make easily prepared meals and is able to cook for himself daily, and for the family several times a week. (R. 154.) She listed Mr. DeLuca's hobbies as reading the news online, taking care of the animals and playing computer games. (R. 156.)  Ms.DeLuca stated that Mr. DeLuca's also "does the dishes or laundry to help [Ms.DeLuca] out while [she] is at work."  (R. 152.)  She stated that Mr. DeLuca is able to engage in social activities, such as talking with his family and friends on the phone or on the computer, and having people over to watch TV with him every month or so.  *Id.*  Further, Ms. DeLuca noted that Mr. DeLuca "gets along very well with others," "handles stress very well" and "handles changes as well as anyone." (R. 158.)

Regarding Mr. DeLuca's impairments, Ms. DeLuca noted that he goes out "3-4 times daily to back track what he has done" because he "[f]orgets if he has given [the pets] food, opened door, etc." and that he is unable to do long errands, as he gets ill if he walks for too long. (R. 155.)  She stated that Mr. DeLuca has difficulty reading and taking care of the pets "due to memory loss and/or concentration" on the task. (R. 156.)  He also has difficulty following even a simple recipe and requires repeated instructions and assistance to ensure he completes all the steps. (R. 157.)  She has further noticed that Mr. DeLuca's disability affects his "memory,

---

[10] On September 19, 2007, after having terminated his rehabilitation therapy, Sandra Schwalbe, Case Coordinator at the Brain Injury Clinic, noted that Mr. DeLuca was "encouraged to contact State Rehabilitation services for vocational counseling, evaluation services and possible work options" and stated that the clinic "may be beneficial at that time to provide strategies for a specific job." (R. 317.) She further noted that Mr. DeLuca was still "considering the recommendation." *Id.*

concentration," his ability to find words, as well as his "reading and comprehension and fine motor skills." (R. 159.)

**D. Mr. DeLuca's Testimony**

At the administrative hearing on March 16, 2009, Mr. DeLuca testified that he had not worked since January of 2001 and that he had left his job as an installation manager at Honeywell due to not being "strong" enough mentally or physically to continue. (R. 22, 30-31.) Mr. DeLuca stated his hobbies include surfing the internet and taking care of his pets, including a dozen chickens, a dog, a cat and a parrot. (R. 38-39.) He further indicated that he is able to drive a car, shop (from the computer and at stores) and that he has no problem with personal care. (R. 161, 163.)

Mr. DeLuca testified that his physical symptoms include motion sickness, nausea, headaches, and pain in his right shoulder. (R. 31-32.) He noted that he feels nauseated and motion sick after walking around for half an hour to an hour and that it takes "15 [to] 20" minutes of sitting down to recuperate. (R. 31.) Mr. DeLuca stated that he has headaches 80 percent of the time, but that he does not take medication because, after his brain aneurysm surgery, the medication prescribed to him "didn't work." (R. 50.) Mr. DeLuca testified that physical exertion and activity causes his headaches. (R. 51.) Mr. DeLuca also explained that he has difficulties with concentration and memory. (R. 33, 36.) While Mr. DeLuca testified that he is able to bathe, feed and dress himself, he claimed that he is unable to use the stove due to his propensity to turn it on and walk away. (R. 34.) Mr. DeLuca stated that he "[has] a problem every day . . . more than one thing," such as going to a grocery store with a list and returning without any of the items. (R. 36-37.) Mr. DeLuca noted that he is unable to help at his son's pizza shop because his memory does not allow him to "even . . . take an order over the phone."

(R. 40.)   Mr. DeLuca testified that he gets frustrated with his limitations and runs out of energy quickly. (R. 37-38.)   He explained that this frustration applies to both chores and hobbies, although he does not get as frustrated when working on things that he enjoys, such as caring for his pets. (R. 39-40.)

### E.  Medical Expert's Testimony

Jared Frazin, M.D., testified as the Medical Expert ("ME") at the administrative hearing. (R. 52.)   Dr. Frazin noted that Mr. DeLuca had a history of "headaches and vertigo . . . [d]epression [and] cognitive difficulties." (R. 53.)   Dr. Frazin acknowledged, however, that organic brain syndrome "is not within [his] area of expertise;" thus he was unable to evaluate the "various opinions regarding the severity . . . and the cause of [Mr. DeLuca's] cognitive impairment." (R. 53-54 ("[It is] not within my area of expertise to look at all the different tests and try to interpret [them] and . . . decide which doctor's opinion is better than one of the other doctors.")) Dr. Frazin determined that, based on Mr. DeLuca's impairments arising from the aneurysm clipping and shoulder impingement (and without considering symptoms related to organic brain syndrome), Mr. DeLuca did not meet the Social Security Administration's requirements for disability. (R. 53-54 ("I'd be looking at . . . the history of the aneurysm clipping and the shoulder impingement [which] don't meet or equal the [SSA's medical] listing.")) Still, in light of Mr. DeLuca's shoulder impingement, Dr. Frazin would restrict him to "light work . . . [w]ithout any overhead reaching." (R. 54.)

### F.  Vocational Expert's Testimony

Mitch Norman testified as the Vocational Expert ("VE") at the administrative hearing. (R. 55.)   Mr. Norman stated that Mr. DeLuca could not perform any of his past jobs, or jobs like them, due to physical and mental impairments. (R. 56.)   The ALJ first posed a hypothetical in

which the individual would be able to: lift only 20 pounds occasionally; be seated or on his feet for six of the eight hours in a workday; and perform semi-skilled work, in which the worker would be able to use lists to keep track of complex tasks. (R. 57.) The VE testified that, under those limitations, and taking into account Mr. DeLuca's skill sets derived from his past work, Mr. DeLuca could work as a wire harness assembler, a position that had 5,800 openings available in Minnesota. *Id.* The ALJ then posed a second hypothetical that included the above restrictions, as well as several additional limitations: first, the individual would only be able to perform simple, unskilled work; second, said work would be routine and repetitive; and, finally, the worker could have only superficial contact with others. *Id.* The VE believed, under those restrictions, Mr. DeLuca could work as a bench assembler or mail clerk, positions for which there were 5,500 and 4,800 openings within Minnesota, respectively. (R. 57-58.) The ALJ, prompted by Mr. DeLuca's counsel, posed another hypothetical in which the individual's ability to work near others without being distracted and to "sustain ordinary routine without special supervision" was fair to poor. (R. 59.) The VE testified that, under those circumstances, Mr. DeLuca would be unemployable. *Id.*

### G. ALJ's Decision

The ALJ followed the five-step sequential process outlined in 20 C.F.R. § 404.1520 to determine if Mr. DeLuca was disabled. At the first step, the ALJ found that Mr. DeLuca had not engaged in substantial gainful activity since the alleged onset of his disability on July 1, 2005. (R. 13.)

At the second step, the ALJ found that, through the date last insured, Mr. DeLuca suffered from five severe impairments:[11] encephalopathy, major depression, a history of surgery

---

[11] A severe impairment is one that "significantly limits an individual's ability to perform basic work activities." 20 C.F.R. § 404.1520(c).

to repair brain aneurysm, organic brain syndrome, and a history of bilateral shoulder impingement syndrome. *Id.*

At the third step, the ALJ concluded that Mr. DeLuca did not have a combination of impairments that medically equaled any listed in the regulations under Subpart P, Appendix 1, 20 C.F.R. §§ 404.1525, 404.1526. The ALJ determined that Mr. DeLuca did not have a "musculoskeletal impairment severe enough to meet the requirements" and further noted that his mental impairments were not sufficient to meet the criteria of 12.02 (Organic Mental Disorders) or 12.04 (Affective Disorders)[12] under Subpart P, Appendix 1 of 20 C.F.R. 404. (R. 14.)

At the fourth and fifth steps, the ALJ considered whether Mr. DeLuca's RFC, age, education and work experience would keep him from performing past relevant work or work associated with any job existing in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520(c) and (g). The ALJ considered Mr. DeLuca's symptoms in determining that he had the RFC "to perform light work" with the limitation of "occasional use of the right shoulder for overhead tasks and reaching" and the additional limitation of "simple to semi-skilled tasks" with the ability to "use lists for more complex tasks." (R. 16.) The ALJ concluded that Mr. DeLuca's "medically determinable impairments could reasonably be expected to cause [his] alleged symptoms," however, Mr. DeLuca's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent" with the ALJ's RFC assessment. (R. 16.) The ALJ found that the record lacked "significant abnormal findings," that Mr. DeLuca had not followed through with recommended treatment, and that there were "inconsistencies in the record regarding the claimant's daily activities." (R. 17.) The ALJ acknowledged Mr. DeLuca's history of steady work until 2001 as a "favorable credibility

---

[12] Affective disorders are "characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome." 20 C.F.R. § 404, Subp. P, App. 1.

factor," but noted his receipt of a severance package upon departure and his failure to make "any effort to seek vocational rehabilitation" or "any attempt to find different work within his limitations." *Id.*

The ALJ did not give "substantial weight" to the opinions of Dr. Hoj or Dr. Montgomery, finding in both cases that discrepancies existed between their treatment notes and their medical opinions as to the severity of Mr. DeLuca's impairments. (R. 17.)  Further, the ALJ expressed that they had not treated Mr. DeLuca for a long enough period of time to afford their opinions significant weight. *Id.* The ALJ did, however, give "some weight" to the opinions of the state agency medical consultants to the extent the "objective medical evidence" supported their opinions. *Id.*  Ultimately, the ALJ found that Mr. DeLuca's RFC would prevent him from performing his past relevant work, but that it would not keep him from working several jobs that existed in significant numbers in the national economy. (R. 18.)  Therefore, the ALJ held that Mr. DeLuca was not disabled under the meaning of the Social Security Act from July 1, 2005 (the date on which Mr. DeLuca alleged his impairment arose) through March 31, 2007 (the date on which Mr. DeLuca was last insured). (R. 11, 18.)

### III.    STANDARD OF REVIEW

Judicial review of the final decision of the Commissioner is restricted to a determination of whether the decision is supported by substantial evidence on the record as a whole. *See* 42 U.S.C. § 405(g); *see also Qualls v. Apfel*, 158 F.3d 425, 427 (8th Cir. 1998); *Gallus v. Callahan*, 117 F.3d 1061, 1063 (8th Cir. 1997); *Wilson v. Sullivan*, 886 F.2d 172, 175 (8th Cir. 1989). Substantial evidence means more than a mere scintilla; it means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co., v. NLRB*,

305 U.S. 197, 220 (1938)).  In determining whether evidence is substantial, a court must also consider whatever is in the record that fairly detracts from its weight. *See Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999); *see also Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir.1989) (citing *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)).

A court, however, may not reverse merely because substantial evidence would have supported an opposite decision. *See Roberts v. Apfel*, 222 F.3d 466, 468 (8th Cir. 2000); *see also Gaddis v. Chater*, 76 F.3d 893, 895 (8th Cir. 1996).  "As long as substantial evidence in the record supports the Commissioner's decision, we may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome . . . or because we would have decided the case differently. *Roberts v. Apfel*, 222 F.3d at 468 (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Oberst v. Shalala*, 2 F.3d 249, 250 (8th Cir. 1993) (citing *Robinson v. Sullivan*, 956 F.2d 836, 838) (8th Cir. 1992)). Therefore, our review of the ALJ's factual determinations is deferential, and we neither re-weigh the evidence, nor review the factual record de novo. *See Flynn v. Chater*, 107 F.3d 617, 620 (8th Cir. 1997); *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996). The Court must "defer heavily to the findings and conclusions of the SSA." *Howard v. Massanari*, 255 F.3d 577, 581 (8th Cir. 2001).

## IV.    CONCLUSIONS OF LAW

### A.  Applicable Legal Standard

Disability is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In order to make a disability determination, the Secretary promulgated a sequential evaluation process that applies to both physical and mental disorders. 20 C.F.R. § 404.1520 outlines the five-step sequential process used by the ALJ to determine whether a claimant is disabled. The disability determination requires a step-by-step analysis. *See* 20 C.F.R. § 404.1520(a). At the first step, the ALJ must consider the claimant's work history. At the second step, the ALJ must consider the medical severity of the claimant's impairments. At the third step, the ALJ must consider whether the claimant has an impairment or impairments that meet or equal one of the listings in Appendix 1 to Subpart P of the regulations. *See* 20 C.F.R. § 404.1520(d). If the claimant's impairment does not meet or equal one of the listings in Appendix 1, then the ALJ must assess the claimant's residual functional capacity and the claimant's past relevant work. 20 C.F.R. § 404.1520(a)(4)(iii). If the ALJ determines that the claimant can still perform his or her past relevant work, the ALJ will find that the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant cannot perform his or her past relevant work, then the "burden shifts to the Commissioner to prove, first, that the claimant retains the [RFC] to perform other kinds of work, and, second, that other such work exists in substantial numbers in the national economy." *Cunningham v. Apfel*, 222 F.3d 496, 501 (8th Cir. 2000).

### B. The ALJ's Decision Is Supported by Substantial Evidence on the Record as a Whole.

Mr. DeLuca contends that the ALJ made five errors in determining his RFC and denying him DIB: first, the ALJ improperly weighed the opinions of Dr. Hoj and Dr. Montgomery; second, the ALJ substituted his own opinion for that of Mr. DeLuca's examining medical sources; third, the ALJ improperly based his decision on isolated, non-contextual items of

evidence instead of on the medical record as a whole; fourth, the ALJ unreasonably rejected Mr. DeLuca's subjective account of his symptoms as well as evidence provided by Mr. DeLuca's wife regarding those symptoms; and fifth, the ALJ improperly relied upon the VE's opinion, which itself was based on an incomplete and inaccurate hypothetical question. (ECF No. 6 at 15-16, 28.)  These five claims fall into three broader categories: the ALJ's distribution of weight to the medical sources; the ALJ's assessment of Mr. DeLuca's credibility; and finally, the hypothetical posed to the VE.

The issue before the Court is whether the ALJ committed the foregoing alleged errors, and if so, whether any such error resulted in an improper RFC determination.  The Court finds that the ALJ's RFC assessment is supported by substantial evidence on the record as a whole. As such, the ALJ's decision should be affirmed.

### 1. The ALJ's Allocation of Weight to the Medical Sources Was Not Improper.

Mr. DeLuca argues that the ALJ improperly weighed the opinions of Dr. Hoj and Dr. Montgomery under SSR 96-2P.[13] (ECF No. 6 at 15-16.)  The ALJ allocated little weight to Dr. Hoj's and Dr. Montgomery's opinions due to the brevity of their treatment relationship with Mr. DeLuca and inconsistencies between their treatment notes and their opinions. (R.17.)  In light of the medical record as a whole, the Court finds that the ALJ's decision to give neither substantial nor controlling weight to the opinions of Dr. Hoj and Dr. Montgomery was not improper.

When determining how much weight to allocate to a medical opinion, the ALJ must determine whether a treating source,[14] a nontreating source[15] or a nonexamining source[16] issued

---

[13] SSR 96-2P's purpose is to "explain . . . when treating source medical opinions are entitled to controlling weight, and to clarify how the policy is applied."  SSR 96-2P, 1996 WL 374188 at *1 (July 1996).

[14] A treating source is a "physician, psychologist, or other acceptable medical source" who has provided or provides the patient with "medical treatment or evaluation" on an ongoing basis.  20 C.F.R. § 404.1502.  While a treating

the opinion. 20 C.F.R. § 404.1527.   The ALJ must give the opinion of a treating source "controlling weight" if the "treating source's opinion on the issue of the nature and severity of [the claimant's] impairment is well-supported by medically acceptable clinical and laboratory diagnostic techniques and [is] not inconsistent with the other substantial evidence in [the] case record."[17] 20 C.F.R. § 404.1527(d)(2).   If the ALJ finds that a treating source's opinion is not due controlling weight, or that the opinion comes from a nontreating or nonexamining source, the ALJ must evaluate the following in order to determine how much weight to give the opinion: (1) the length of the treatment relationship and frequency of the examinations; (2) the nature and extent of the treatment relationship; (3) the quantity of evidence in support of the opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the physician is a specialist in the area of the claimant's impairment; and (6) other factors brought to the ALJ's attention. 20 C.F.R. § 404.1527(d)(1)-(6); *Owen v. Astrue*, 551 F.3d 792, 799 (8th Cir. 2008).   While the ALJ is generally required to give more weight to a medical source that has treated or examined the claimant, the other factors in the analysis may counterbalance this assumption. 20 C.F.R. § 404.1527(d).   Additionally, an ALJ must assign little weight to a medical source's opinion "where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Proscho v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2001).

### a.  Dr. Hoj's Opinion

---

source does not need to have seen the patient a large number of times, the treatment or evaluation must be "typical for [the patient's] conditions." *Id.*

[15] A nontreating source is a source that has examined the claimant, but does not have an "ongoing treatment relationship" with him or her. 20 C.F.R. § 404.1502.

[16] A nonexamining source is a medical source "who has not examined [the claimant] but provides a medical or other opinion in [the claimant's] case."  20 C.F.R. § 404.1502.

[17] Social Security Ruling 96-2P further clarifies that an opinion must come from a treating source, must be a medical opinion, must be well-supported by clinical and laboratory diagnostic techniques, and must not be inconsistent with other substantial evidence on the medical record in order to afford it controlling weight.  SSR Ruling 96-2P, 1996 WL 374188, at *1 (July 1996).

Mr. DeLuca argues that the ALJ's allocation of weight to Dr. Hoj's opinion was improper under SSR 96-2P because Dr. Hoj is a treating source whose opinion is entitled to controlling weight. (ECF No. 6 at 15-16, 23-24.)   The Court, however, finds that the ALJ considered Dr. Hoj's records and presented a satisfactory explanation for the weight he allocated to Dr. Hoj's opinion.[18]   The ALJ rejected Dr. Hoj's determination that Mr. DeLuca is unable to work, citing the brevity of his treatment relationship with Mr. DeLuca and the fact that his "treatment notes do not reflect abnormal findings on examination to support his statement that the claimant lacks the capacity to maintain the concentration, persistence and pace necessary to sustain any type of competitive work activity." (R. 17.)   The ALJ also noted that Dr. Hoj's examinations of Mr. DeLuca "show few abnormalities beyond some memory problems on an informal test of mental status." (R. 17, 324-332.)   Further, it is not evident to the Court that Dr. Hoj provided Mr. DeLuca with "ongoing treatment" (having had a few appointments with Mr. DeLuca over only a matter of months) or that he ought to be considered a "treating source," thus requiring greater deference. 20 C.F.R. § 404.1502. Because the ALJ appears to have considered the factors set forth in 20 C.F.R. § 404.1527(d)(1)-(6) in making his determination, he did not err by failing to accord significant weight to Dr. Hoj's opinion. (*See* R. 17.)

### b.  Dr. Montgomery's Opinion

The Court also finds Mr. DeLuca's contention that the ALJ should have afforded the opinion of Dr. Montgomery controlling weight unpersuasive. The ALJ did not allocate substantial weight to Dr. Montgomery's opinion in light of the brevity of his relationship with

---

[18] In his findings, the ALJ states: "As for the opinion evidence, I have not given controlling or substantial weight to the opinion of Dr. Hoj, the neurologist, regarding the claimant's functional limitations. Dr. Hoj examined the claimant on only three or four occasions between March 2007 and January 2008. Examinations show few abnormalities beyond some memory problems on an informal test of mental status. Dr. Hoj's treatment notes do not reflect abnormal findings on examination to support his statement that the claimant lacks the capacity to maintain the concentration, persistence and pace necessary to sustain any type of competitive work activity. Dr Hoj's opinion is thus not entitled to significant weight." (R. 17 (internal citations omitted).)

Mr. DeLuca, the lack of continued treatment, and the inconsistencies between Dr. Montgomery's treatment notes and his opinion.[19] (R. 17.)  The ALJ noted that "[t]here is no evidence that the claimant was treated by Dr. Montgomery, or that the claimant was seen in the brain injury clinic after the initial evaluation in June 2007." (R. 17.) Dr. Montgomery's single examination of Mr. DeLuca entitles Dr. Montgomery to "examining source" rather than "treating source" status; his opinion is thus not due controlling weight. *See Britton v. Astrue*, 622 F.Supp.2d 771, 787 (D. Minn. 2008) (holding that physicians who examine claimants once are nontreating sources); 20 C.F.R. § 404.1527(d)(2). Because the ALJ appears to have considered the factors set forth in 20 C.F.R. § 404.1527(d)(1)-(6) in making his determination, he did not err by failing to accord significant weight to Dr. Montgomery's opinion.[20] (*See* R. 17.)

### 2.   The ALJ's Evaluation of Mr. DeLuca's Credibility Was Not Improper.

Mr. DeLuca argues that the ALJ unreasonably rejected Mr. DeLuca's subjective account of his symptoms. (ECF No. 6 at 27.)  The ALJ found Mr. DeLuca's testimony related to the "intensity, persistence and limiting effects of [his] symptoms" to be not credible. (R. 16.)  The ALJ gave little credence to Mr. DeLuca's subjective complaints because the "medical evidence in the record does not entirely corroborate [Mr. DeLuca's] testimony," Mr. DeLuca "rejected or quickly abandoned all prescribed treatment," and the record "contains inconsistencies with

---

[19] In his findings, the ALJ states: "I have also not given substantial weight to the opinion of George Montgomery, Ph.D., L.P. a neuropsychologist and director of the brain injury clinic where the claimant was treated from June through September 2007. Dr. Montgomery's opinion is also not supported by the treatment notes. The intake assessment stresses that the claimant's reported disability far exceeded what would be expected given normal or near normal test results. The occupational therapy was discontinued by the claimant after only three sessions. There is no evidence that the claimant was treated by Dr. Montgomery, or that the claimant was seen in the brain injury clinic after the initial evaluation in June 2007. For these reasons, Dr. Montgomery's opinion is not entitled to substantial weight." (R. 17.)

[20] The Court also finds unpersuasive Mr. DeLuca's argument that the ALJ considered only "isolated specific items of evidence, out of context, without considering the record as a whole," which Mr. DeLuca bases on the fact that the ALJ quoted only a small part of Dr. Montgomery's opinion in his findings. (ECF No. 6 at 23.) The ALJ is not required to "explicitly discuss every piece of evidence presented" in order to consider each piece of evidence fully. *See Britton*, 622 F.Supp.2d at 775 (citing to *Miller v. Shalala*, 8 F.3d 611, 613 (8th Cir. 1993). The ALJ discussed Dr. Montgomery's opinion several times in his decision and addressed his reasons for affording it the weight he did. (R. 14, 17.)  Nothing more is required of the ALJ in this respect.

regard to [Mr. DeLuca's] daily activities." (R. 16-17.)   The Court finds that the ALJ contemplated the factors set forth in *Polaski v. Heckler* in discounting Mr. DeLuca's subjective complaints. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).

In evaluating "the degree or severity of subjective complaints," the ALJ must "give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians . . . ."  *Id.* at 948.  With these sources in mind, the ALJ should consider such matters as: "1. the claimant's daily activities; 2. the duration, frequency and intensity of the pain; 3. precipitating and aggravating factors; 4. dosage, effectiveness and side effects of medication; 5. functional restrictions." *Id.*  Claimants must provide more than "statements about [their] pain or other symptoms," but must also provide "medical signs and laboratory findings which show [that the claimant has] a medical impairment which could be reasonably expected to produce the pain or other symptoms alleged . . . ." 20 C.F.R. § 404.1529(a).  Other relevant factors include "the claimant's relevant work history and the absence of objective medical evidence to support the complaints."  *Gowell v. Apfel,* 242 F.3d 793, 796 (8th Cir. 2001) (quoting *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)).  Still, the ALJ "may not disregard a claimant's subjective pain allegations solely because they are not fully supported by the objective medical evidence." *Chamberlain v. Shalala*, 47 F.3d 1489, 1494 (8th Cir. 1995) (citing *Sullins v. Shalala*, 25 F.3d 601, 603 (8th Cir. 1994)).  However, "[s]ubjective complaints may be discounted if there are inconsistencies in the evidence as a whole." *Polaski*, 751 F.2d 948.  Not every factor need be discussed by the ALJ, and as long as the ALJ "gives a good reason" for discrediting a claimant's credibility, "[the court] will defer to its judgment." *Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001) (citing *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)).

The ALJ found that Mr. DeLuca's testimony as to his daily activities was inconsistent with his reported subjective complaints. (R. 17.)  The ALJ noted that Mr. DeLuca's ability to "prepare simple meals, tend to his chickens several times, as well as to his other pets, and use a computer from 9 p.m. until midnight" indicated a "mild restriction" in the "activities of daily living" as opposed to the far more severe limitations alleged by Mr. DeLuca. (R. 15, 17.)  When a claimant's daily activities indicate lesser impairments than claimed, the ALJ may find them to diminish credibility.  *See, e.g.*, *Haley v. Massanari*, 258 F.3d 742, 748 (8th Cir. 2001) (finding that the claimant's daily activities, including driving, cooking, shopping, visiting friends and relatives and watching television, were inconsistent with the plaintiff's claimed level of impairment); *Riggins v. Apfel*, 177 F.3d 689, 692 (8th Cir. 1999) (finding activities such as driving, shopping, visiting with relatives and watching television were inconsistent with plaintiff's level of pain).

The ALJ also highlighted inconsistencies between the complaints of Mr. DeLuca and the record as a whole.  For example, the test conducted by Dr. Risse in January of 2007 demonstrated that Mr. DeLuca was of average intelligence and caused Dr. Risse to believe that Mr. DeLuca was "functioning at a significantly higher level than he perceives." (*See* R. 17, 242.) Dr. Risse further explained that "[Mr. DeLuca's] deficits are mild and in general are not consistent with the degree of [his] complaints." (R. 241.) The ALJ also noted that Mr. DeLuca did not seek treatment for his "functional limitations" until November 2006, nine years after his aneurysm surgery and a year and a half after the alleged onset of his disability. (R. 16, 36.)  A gap between the alleged onset of the impairment and treatment may be considered when determining a claimant's credibility. *See McClees v. Shalala*, 2 F.3d 301, 303 (8th Cir. 1993).

Furthermore, a claimant's failure to comply with prescribed medical treatment and a lack of significant medical restrictions is inconsistent with complaints of disabling impairment. *Eichelberger v. Barnhart*, 390 F.3d 584, 590 (8th Cir. 2004), citing *Brown v. Chater*, 87 F.3d 963, 965 (8th Cir. 1996). The ALJ noted that Mr. DeLuca discontinued a neurorehabilitation course and an occupational therapy course—the former after two sessions, and the latter after only three. (R. 314-18, 366-70.) Additionally, Mr. DeLuca's occupational therapist recommended that he "consider contacting the Minnesota Workforce to explore vocational options." (R. 316.)  There is no indication in the record that Mr. DeLuca ever followed this recommendation, or the recommendation from the Brain Injury Center to contact State Rehab Services for "counseling, evaluation and work placement." (R. 318.)  Despite Mr. DeLuca's decision to terminate these courses of treatment because he felt they were "not helping him" (R. 317), the record reflects that several caregivers believed that Mr. DeLuca would benefit from therapy. (R. 301, 341, 367.) The ALJ also noted that Mr. DeLuca refused psychotherapy for his depression (R. 17), despite being told by his primary care physician that it may help with his memory issues. (R. 301.)  The ALJ's consideration of these factors in determining Mr. DeLuca's credibility was proper.[21]

Because the ALJ considered the inconsistencies between Mr. DeLuca's complaints and the overall record, and appears to have contemplated the factors set forth in *Polaski* in evaluating his credibility, the Court finds that the ALJ did not err in discounting Mr. DeLuca's subjective complaints.

---

[21] The ALJ's use of Mr. DeLuca's refusal to take prescribed medication, however, was improper.  The Eighth Circuit requires that the ALJ take into consideration adverse side effects when considering the treatment history of a claimant, which the ALJ failed to do here when considering Mr. DeLuca's refusal to continue treatment with antidepressants or other medication.  (R. 17-18); *see O'Donnel v. Barnhart*, 318 F.3d 811, 819 (8th Cir. 2003).  In his findings, the ALJ failed to mention Mr. DeLuca's complaints of side effects from the medication, including weight loss and nausea, but still found Mr. DeLuca's refusal to take anti-depressants weighed against his credibility. (R. 17.)  While the Court finds that the ALJ erred in this respect, the error is inconsequential when considered in light of the other *Polaski* factors.

### 3. The ALJ's Assessment of Mr. DeLuca's RFC Is Supported By Substantial Evidence.

In determining that Mr. DeLuca could perform "light work," the ALJ found that, while he would not be able to perform his previous job, Mr. DeLuca would be able to perform "simple, unskilled work" that requires "three to four step tasks at most" and "no more than brief, superficial contact with others." (R. 18, 57.) In light of the record as a whole, the ALJ's RFC determination was not improper.

SSR 96-8p defines RFC as an "administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect [the claimant's] capacity to do work-related physical and mental activities." SSR 96-8p, 1996 WL 374184 at *2 (July 2, 1996). This Ruling requires that the ALJ's RFC assessment be based on all of the relevant evidence in the case, including medical history, effects of treatment, reports of daily activities, medical source statements, and effects of symptoms, including pain, that are reasonably attributed to the claimant's medically determinable impairments. *Id.* at *5. When determining the RFC of a claimant, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7.

As discussed above, the ALJ addressed the inconsistencies in the record and expressed his reasons for discounting Mr. DeLuca's credibility as well as the opinions of Dr. Hoj and Dr. Montgomery. Because the ALJ's RFC assessment appears to have been based on "all of the relevant evidence in the case record," and the ALJ explained how he resolved the "material inconsistencies" in the record, the Court finds his RFC determination was supported by

26

substantial evidence in the record as a whole. As such, the hypothetical questions posed to the VE were also supported by the record and were not improper.[22]

Despite Mr. DeLuca's inability to perform his past relevant work, the Commissioner has met his burden to show that Mr. DeLuca retained the RFC to perform other work that exists in substantial numbers in the national economy. For the foregoing reasons, the Court finds that the ALJ's determination that Mr. DeLuca was not disabled on his date last insured is supported by substantial evidence on the record as a whole. (*See* R. 18-19.) The Commissioner's decision to deny Mr. DeLuca DIB should be affirmed.

## V.    RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.    Plaintiff's Motion for Summary Judgment (ECF No. 6) be **DENIED**;

2.    Defendant's Motion for Summary Judgment (ECF No. 15) be **GRANTED**;

3.    The Commissioner's decision be **AFFIRMED** and this case be **DISMISSED with prejudice**; and

4.    **JUDGMENT BE ENTERED ACCORDINGLY.**


DATED: May 25, 2011                          *s/ Franklin L. Noel*
                                             FRANKLIN L. NOEL
                                             United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before June 8, 2011, written objections that specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within fourteen (14) days after service thereof. All briefs filed under the rules shall

---

[22] An ALJ's hypothetical question to a VE is proper if it "sets forth impairments supported by substantial evidence in the record and accepted as true by the ALJ." *Guilliams v. Barnhart*, 393 F.3d 798, 804 (8th Cir. 2005) (citing *Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001)). An ALJ can discount subjective complaints in creating a hypothetical question "as long as the ALJ had reason to discredit them." *Guilliams*, 393 F.3d at 804.

be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.